# Wytheville

## MAE INMAN v. HERBERT A. INMAN.

June 16, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Henry Bowden* and *Charles S. Grant*, for the appellant.

*James E. Heath* and *Swink & Fentress*, for the appellee.

EPES, J., delivered the opinion of the court.

On September 6, 1930, Herbert A. Inman instituted his suit for divorce against his wife, Mae Inman. In his bill

he alleges as his sole ground for a divorce that his wife had deserted him on or about September 2, 1930. The subpoena summoning her to answer the bill and notice to take depositions were served upon Mrs. Inman in person on September 6, 1930. Mrs. Inman did not enter her appearance in the suit and was not present or represented at the taking of the depositions. On October 23, 1930, the court entered its decree whereby it adjudged that Mrs. Inman had wilfully and without just cause deserted her husband, granted to Mr. Inman a divorce *a mensa* on that ground, and decreed that the marital rights of each party in and to any property owned by the other were extinguished.

On November 3, 1930, during the same term of the court at which the decree of October 23rd was entered, on the motion of Mrs. Inman, the court entered its decree setting aside and annulling its decree of October 23rd, and granted Mrs. Inman leave to file her answer and cross bill. In her answer and cross bill Mrs. Inman denied that she had deserted her husband, alleged that he had deserted her, and prayed that she be granted a divorce from her husband on that sole ground and awarded both temporary and permanent alimony. Depositions were taken by Mrs. Inman to sustain her answer and cross bill, and depositions were taken by Mr. Inman in rebuttal.

On August 23, 1931, the court entered its decree, which, in so far as is here material, reads as follows: "It is adjudged, ordered and decreed that the decree entered herein on November 3, 1930, be rescinded, vacated and set aside, and that the decree entered herein on October 23, 1930, be reinstated." From this decree Mrs. Inman has appealed.

We shall first consider the aspect of the cause presented by Mr. Inman's bill for a divorce from his wife.

The only allegations in Mr. Inman's bill relating to his charge that Mrs. Inman had deserted him are as follows:

"On or before the 2nd of September, 1930, the said Mae

W. Inman, respondent herein, advised and stated to your complainant that she did not intend to live with your complainant, and that she was going to leave your complainant and would not return to him; and thereafter, while your complainant was absent from the city of Norfolk, Virginia, the said respondent packed up and removed her personal belongings, household furniture, and other property, from the residence theretofore occupied by your complainant and said respondent at No. 1322 Brunswick Park, Norfolk, Virginia, and  *  *  *  has left the city of Norfolk, Virginia; and your complainant alleges that the said Mae W. Inman has wilfully abandoned and deserted your complainant."

The only depositions which were taken in this cause prior to November 3, 1930, were the depositions of Mr. Inman, Mrs. Hubert White and Miss Cowell, which were taken on behalf of Mr. Inman. Mrs. White was the next door neighbor and intimate friend of Mr. and Mrs. Inman. Miss Cowell was an employee of Powers and Anderson Surgical Instrument Company, Incorporated, of which Mr. Inman was the general manager, and by which Mrs. Inman was employed as an assistant to her husband. In so far as these depositions have any bearing upon the alleged desertion of her husband by Mrs. Inman, or relate to anything which led up to, or took place at the time of, or after, the alleged desertion, they are quoted in full below.

The deposition of Herbert A. Inman, the plaintiff:

"Q. In your bill you allege that on or about the 2nd of September, 1930, the respondent stated to you that she did not intend to live with you any longer, and that she was going to leave you and would not return to you. Will you please state what statement she made to you at that time?

"A. She stated that she was through with me, and I could consider that she was finished, and that she was leaving.

"Q. Do you know whether or not she has left?

"A. She has left me, yes.

"Q. Were you in Norfolk at the time she left?

"A. I was not.

"Q. When you returned to Norfolk what condition did you find your home in?

"A. Very little left in it of any value whatsoever. All of the furniture, the silverware, glassware, china and otherwise of any value had been removed. The house was almost vacant of furniture or other household goods.

"Q. Mr. Inman, during your married life did you provide Mrs. Inman a home and contribute to her support?

"A. I did.

"Q. Did you give her any cause for leaving you?

"A. I did not."

The deposition of Mrs. Hubert White:

"Q. Did you notice their family life while they were living next to you for four years? (and) how was it?

"A. I did. Very pleasant at times, most of the time.

"Q. Did you have any conversation with Mrs. Inman in regard to her leaving Mr. Inman during the early part of September of this year?

"A. Yes; she came into my house, and she told me that Mr. Inman knew all of her movements for the last three months, and that she was leaving town immediately.

"Q. Was Mr. Inman in the city at that time?

"A. Mr. Inman was on a business trip at that time.

"Q. Pursuant to that statement did she later leave?

"A. Yes.

"Q. Do you know whether or not she took the furniture, silverware, etc., with her?

"A. She took all the furniture that was of any value with the exception of three pieces.

"Q. Was Mr. Inman in town when she removed the furniture, etc?

"A. No.

"Q. Do you know whether she has lived there since that time or has she been back?

"A. She has not.

"Q. Did she tell you where she was going?

"A. She told me that she was going to Richmond to her mother's, and then she would possibly go on to Washington."

The deposition of Miss Zula Cowell:

"Q. Do you know when she (Mrs. Inman) quit work?

"A. She worked the first three days in September, but did not come back the last part of the first week.

"Q. Did you have any conversation with her during the latter part of the first week in September?

"A. Yes; she came in the store to get her personal belongings. She gave me the key to the safe, and at the time she said she was leaving; that Mr. Inman and she would not live together; that that was the end, and she did not know where she was going, but thought she was going to Richmond.

"Q. Did you have any other conversation with her later?

"A. Yes; she called me up on the day she left and said she was leaving in a few moments.

"Q. Did she say where she was going?

"A. Yes; she said she was going to Richmond.

"Q. Do you know whether she has been back to live in Norfolk since that time?

"A. Not to my knowledge.

"Q. Was Mr. Inman in the city when she turned the key over to you, and later called you up and told you good-bye?

"A. No; when she called me up and told me good-bye he was not in the city."

The decree of October 23, 1930, by which a divorce was

granted to Mr. Inman, was entered upon the allegations and depositions above quoted; and the action of the court in entering its decree of November 3, 1930, vacating and annulling that decree, was plainly right.

■ The complainant had not proved that he had made any attempt to effect a reconciliation with the defendant and to get her to return to and live with him as his wife; nor had he proved any facts or circumstances which excused him from making in good faith such an attempt. On the other hand, the haste with which this suit was instituted after the desertion is alleged to have taken place would seem to negative any desire on the part of Mr. Inman for a reconciliation; and, in the absence of evidence to the contrary, warrants the inference that the complainant feared that, if he did not act promptly, his wife would do some act which would show that she had not deserted him, or (if she had deserted him) would offer to return to and live with him as his wife, before he could institute his suit charging her with desertion.

The entry of a decree for divorce on the ground of desertion under such a state of the pleadings and proof constituted reversible error which the court should have corrected by setting aside the decree. *Sussman* v. *Sussman,* (*ante,* page 382, 163 S. E. 69, 70; *Devers* v. *Devers,* 115 Va. 517, 79 S. E. 1048, 1049; *Tutwiler* v. *Tutwiler,* 118 Va. 729, 88 S. E. 86; *Duff* v. *Duff,* 145 Va. 526, 134 S. E. 555; *Markley* v. *Markley,* 145 Va. 596, 134 S. E. 536.

■ This is a matter which affects not only the plaintiff and defendant, but the State. "The well-being and good order of society demand that husbands and wives shall in good faith endeavor to reconcile their differences and dwell together in unity and peace, rather than to make occasion for resort to the courts for redress." *Devers* v. *Devers, supra.*

■ In *Sussman* v. *Sussman, supra,* this court recently said:

"While it has not been the universal practice to allege that an offer of reconciliation has been made, we think good pleading requires such an allegation in the bill of complaint. In any event, the proof must show that before instituting the suit complainant has offered to become reconciled. If the * * proof fails to show that such an offer has been made, the concern of the court on all other questions is at an end, and a decree dismissing the bill should be entered." This was a case in which the record established no facts which excused the plaintiff for not having sought a reconciliation with his wife. In order that there may be no misunderstanding of that case the court desires to make it plain that it did not intend by what is there said to intimate that there could be no facts and circumstances which would excuse a husband or wife for not having sought a reconciliation before filing suit for divorce on the grounds of desertion. But where such facts and circumstances exist they should be pleaded, and they must be proven to sustain the bill.

When we come to examine the depositions taken after November 3, 1930, we find no evidence which tends to show that Mr. Inman at any time offered to become reconciled with his wife and to live with her again as her husband, or that there were any facts and circumstances which excused him for not having done so. On the contrary, we think that when all the evidence in the cause is read together, it shows that if there was any desertion by either party, Mr. Inman deserted Mrs. Inman.

It follows that the court was in error in having entered any decree the effect whereof was to grant to Mr. Inman a divorce from Mrs. Inman, and, therefore, even if the decree of August 31, 1930, be otherwise unobjectionable, the court erred in entering that decree.

This brings us to the second aspect of this cause, that is, Mrs. Inman's suit for a divorce from her husband which is presented in her cross bill.

Upon principle, the same rules with reference to the allegation and proof of an offer of reconciliation apply to a suit for divorce on the sole ground of desertion brought by a cross bill which apply to such a suit brought by an original bill. Mrs. Inman in her answer and cross bill denies that she has deserted her husband, and alleges that "she desires to be reconciled with him, and for him to return to live with her as man and wife, and thereby sincerely offers so to do;" and she reiterates this in her testimony. But there is no evidence to show that she made such an offer or attempted to get him to return to her as her husband, until she did so in her answer and cross bill in which she prays for a divorce from him and an award of alimony. This, we think, comes too late to afford a basis upon which to ground her prayer for a divorce on the sole ground of desertion, *unless* the facts and circumstances of the case are such as to have excused her for not having made such an offer before she filed her cross bill.

The record presents a case in which Mrs. Inman had greater provocation to leave her husband than he had to leave her, and there is more to excuse her for not having sought a reconciliation before filing her cross bill than there is to excuse him for not having done so before he instituted his suit. But the question here presented is not which of these parties is the least to blame, but does the record show that Mrs. Inman has performed the duty with reference to attempting in good faith to effect a reconciliation which the law imposes upon her as a prerequisite to her being entitled under her cross bill to a divorce on the sole ground of desertion? Upon a consideration of the whole record, we think that it does not.

Her testimony shows that from September 3rd on, she was cognizant of all steps that were being taken by her husband to secure a divorce from her on the ground that she had deserted him. She herself had several interviews

with counsel for her husband between September 3rd and September 6th (the day on which he instituted his suit), at one of which Mr. Inman was present; and her original counsel (Mr. Wagenheim) had several other interviews with counsel for Mr. Inman between September 6th and September 15th. But so far as the record shows, these interviews seem to have related almost entirely to a discussion of a settlement of the property rights of the parties and what sum should be paid by Mr. Inman to Mrs. Inman in the event of his procuring a divorce from her. She does not testify, and there is no evidence in the record to show, that in any of these interviews she expressed any desire to have her husband become reconciled to her. While she considered making some defense to Mr. Inman's bill, she instructed her counsel (Mr. Wagenheim) to advise Mr. Inman's counsel on October 11, 1930, that she would not be present at the taking of his depositions and would not at that time make any defense.

Their home in Norfolk was conveyed to them jointly, and their joint equity in it was worth about $4,000.00, or perhaps a little more. Acting through her counsel (Mr. Wagenheim) she entered into an agreement with her husband for a settlement of their property rights and the payment to her of $960.00, which was predicated upon his procuring a divorce from her. Under this agreement, which was fully executed on or about October 15, 1930, Mrs. Inman conveyed to Mr. Inman all her right, title and interest in their home place and he paid her $4,000.00, and also the amount ($960.00) which she would have received as salary had she continued for six months in the employment of Powers and Anderson Surgical Instrument Company as assistant to her husband. Neither in her cross bill nor her testimony does Mrs. Inman offer, or suggest her willingness, to restore the *status quo* with reference to this property settlement, or offer any reason why, if she in good faith desires a reconciliation, she does not do so.

The only excuse which she offers for not having sought a reconciliation prior to the filing of her cross bill is that she was badly advised by her original counsel, Mr. Wagenheim. But she has been content to leave the establishment of this excuse, if it exists, to inference; and in her testimony has touched but lightly upon what took place between her original counsel and herself with reference to his handling of her case. She does testify that, after Mr. Wagenheim had effected this property settlement, he advised her that "he didn't know anything further that could be done," and that for doing nothing further than handling for her this property settlement and money payment he charged her a fee of $1,000.00. But there is no testimony tending to show that she at any time instructed him to suggest a reconciliation with her husband, or expressed to Mr. Wagenheim any desire for such a reconciliation.

While there is evidence tending to show that she was distressed at the rupture that had taken place between her and her husband, it is far from clear from this record that after she discovered that her husband had employed counsel looking to procuring a divorce from her, she had, or expressed even to her counsel, any desire for a reconciliation with him, until after she had employed her present counsel, which was some time between October 23rd and November 3, 1930. On the other hand, there is much about the case to indicate that the offer of reconciliation, which she makes in her cross bill and in her testimony, is made rather to sustain her prayer for a divorce and alimony than to procure a reconciliation.

Upon a consideration of the whole record we are of opinion that neither Mrs. Inman nor Mr. Inman has established a right to a divorce on the ground of desertion. The decree appealed from will be reversed, and a decree here entered dismissing both the bill and the cross bill, with costs to the appellant as the party substantially prevailing.

Mr. Gilbert R. Swink, who had been retained by Mr. Inman as his counsel on September 2, 1930, and has continued as his counsel throughout this controversy and is one of counsel appearing for him in this court, had several interviews and conversations with Mrs. Inman with reference to material matters put in issue in this cause. After Mrs. Inman had testified as to these interviews and conversations, Mr. Swink was introduced by Mr. Inman in rebuttal of her testimony. We do not question the motive or integrity of Mr. Swink in permitting himself to be placed in the position of appearing both as a witness for and counsel for his client; but we must express our disapproval of this practice.

We have had several cases before us comparatively recently in which one of counsel for a party to the cause has also appeared as a material witness for his client, in some instances as the chief witness for his client. Generally speaking, when counsel for a party to a cause finds that he is required as a material witness for his client, he should so advise his client and retire as counsel in the case. Perhaps there are cases in which an attorney may, with propriety, continue as counsel, though he has been called as a witness, but they are rare.

*Reversed.*